**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FERNANDO LOPEZ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 10931 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| THE SHERIFF OF COOK COUNTY; | ) | |
| COOK COUNTY; and | ) | |
| THOMAS RAINES, special representative | ) | |
| for MICHAEL RAINES (deceased), | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

After Fernando Lopez accidentally bumped his car into a car that was parked outside the Funky Buddha Lounge in Chicago, an angry group of men swarmed around Lopez's car. Lopez got out of the car and used a gun to frighten away the assailants. As Lopez walked back to his car, he fired the gun twice in the direction (though at an upward angle) of one of the assailants. By this time, however, off-duty Cook County Sheriff's Officer Michael Raines had arrived. Raines walked towards Lopez and shot him (Lopez luckily survived). The shooting and its aftermath are explored in detail below, prompted by Lopez's civil-rights lawsuit against Cook County, the Sheriff of Cook County, and Officer Raines (Raines has since passed away, so formally, the named defendant is Thomas Raines, the estate's special representative). Lopez alleges that Raines used excessive force and conspired with Cook County and the Sheriff to deprive Lopez of right to access the courts. He also alleges that the municipalities are liable for causing the use of excessive force and

must indemnify Raines. R. 22, Am. Compl. ¶¶ 24-40.[1] The Defendants now move for summary judgment. R. 77, Mot. Summ. J. For the reasons discussed below, the motion for summary judgment is granted.

## I. Background

For purposes of the summary judgment motion, the facts are viewed in the light most favorable to Lopez, the non-movant, and all reasonable inferences are drawn in his favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). To the extent video footage clearly contradicts Lopez, however, the Court considers that evidence without favoring him as the non-movant. *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2008). That is because the Court only views evidence in the non-movant's favor when there is a *genuine* dispute about the facts. *Id*. So the Court will not "indulge stories clearly contradicted by the footage." *Id*. In principle, this is no different than applying the usual summary judgment standard: if a reasonable jury could not view a certain piece of evidence—whether video or not—in the non-movant's favor, then the evidence is not viewed in the non-movant's favor.[2]

On November 30, 2014, at around 3:55 a.m., Fernando Lopez was driving westbound on Grand Avenue when he bumped into a car parked outside the Funky

---

[1]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation. The Court has federal-question jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction under 28 U.S.C. § 1367.

[2]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Defendants' Statement of Facts [R. 78]; "Pl.'s Resp. DSOF" for Lopez's response to the Defendants' Statement of Facts [R. 82]; "PSOF" for Lopez's Statement of Additional Facts [R. 82]; and "Defs.' Resp. PSOF" for Defendants' response to Lopez's Statement of Additional Facts [R. 87].

Buddha Lounge in Chicago. R. 78-4, DSOF, Exh. D, Video 3 at 3:55:43.[3] That event, and much of its aftermath, was captured on the Lounge's security footage. DSOF ¶ 14; R. 78-3, DSOF, Exh. C, Lopez Dep. Tr. 164:15-165:17, 184:23-185:20, 195:18-196:17.[4] After the accident, some bystanders who had been standing outside the lounge (probably including the owner of the now-damaged car and his friends) approached Lopez's car and started to beat Lopez. R. 81, Exh. A, Lopez Dep. Tr. 72:23-24, 74:23-24, 75:1-3, 20-24, 76:1-3, 9-16; Video 3 at 3:55:47. One of Lopez's passengers got out of the back seat and waved a handgun around. R. 82, PSOF ¶ 3. As the assailants started to scatter, Video 3 at 3:55:55, Lopez also got out of the car and took the gun from his passenger, *id.* at 3:56:05. Lopez then crossed the street, holding and at times brandishing the gun, toward the now-scattered ex-assailants. *Id.* at 3:56:05-16; *see also* Video 2 at 3:56:05-16.[5]

Toward the end of Lopez's on-street confrontation with the scattered assailants, Raines arrived at the intersection of Grand, Milwaukee, and Halsted (this is one of Chicago's charming six-way intersections). Video 3 at 3:56:11. Raines was off-duty and had been at a nearby bar. PSOF ¶ 5. As more fully depicted with

---

[3]The defense's Exhibit D comprised four videos from the Lounge's surveillance cameras, which recorded four different vantage points. "Video 3" is an AVI video bearing the filename CH07-20141130-035500-041500. For all the videos, citations to time-stamps represent the actual time of day (rather than how much time has elapsed on a video clip). For example, 3:55:43 is 3:55 a.m. and 43 seconds. The day-of-time stamps appear on the top of the videos.

[4]Although Lopez disputes whether the video footage captures the entirety of the events, he concedes that it captures a "significant" part of the events. PSOF ¶ 14 ("The video captures a significant portion of the incident, but there are portions of the video that are unclear or do not depict the plaintiff ….").

[5]Video 2 is also part of the defense's Exhibit D, R. 78-4, and has the filename CH06-20141130-035500-041500.avi.

snapshots in the Analysis section later in the Opinion, in view of the officer (or at least in hearing range), Lopez walked back toward his car and fired his gun—twice—in the general direction of the assailants (though at an upward angle). Video 3 at 3:56:20. Raines started moving toward Lopez with his gun drawn, and Lopez continued to move toward his car, which was in the general direction of Raines. *Id.* at 3:56:20-24. As Lopez and Raines moved generally toward each other, Lopez waved the gun up to shoulder level and then quickly back down. *Id.* at 3:56:22. Giving Lopez the benefit of the doubt, Lopez was not pointing the gun directly at Raines, but was just waving it up and down; Lopez might not even have realized that Raines was there. Indeed, according to Lopez, Raines did not announce his office and did not order Lopez to drop his gun, PSOF ¶ 8, and the Court credits that assertion at the summary judgment stage.

In any event, as Raines continued moving toward Lopez with his gun drawn, Lopez tried to open his car door with the gun still in hand. Video 3 at 3:56:26. Before Lopez could get into the car, Raines started firing. Raines first struck Lopez at 3:56:27; Lopez dropped the gun one second later as he turned and started to run from Raines; and Raines continued to fire for two more seconds, ending at 3:56:30, for a total of three seconds of shots fired.[6] Lopez ran to the sidewalk with Raines trailing close behind. *Id.* at 3:56:28 to 3:56:34. A sidewalk struggle ensued between the pair,

---

[6]The parties do not pin-down exactly how many of the bullets that Raines fired actually struck Lopez, other than to say "multiple" times. PSOF ¶ 2; Lopez Dep. Tr. at 222-24.

as the officer endeavored to restrain Lopez from behind while holding his arm around Lopez's neck. *Id.* at 3:56:34.

Meanwhile, Lopez's front-seat passenger, Mario Orta, picked up Lopez's gun from the street, Video 3 at 3:56:31, and then almost immediately fired a shot (or possibly two) at Raines, Video 2 at 3:56:32-33. Orta then walked into the lounge's covered entrance just a few feet from where Raines and Lopez were struggling. *Id.* at 3:56:41. After about 13 seconds, Orta reemerged from the lounge, *id.* at 3:56:54, still holding the gun, and walked off for a bit, but then approached Raines again, Video 3 at 3:57:13. Lopez came within a few feet of Raines and then aimed the gun *directly* at Raines. *Id.* at 3:57:19. Orta then backed away several feet and eventually circled around the sidewalk, changing the angle of approach to Raines, who in turn rotated with Lopez so that the officer remained crouched behind Lopez. *Id.* at 3:58:09. Meanwhile, Raines alternated between pointing his gun toward Lopez's temple, waving off persons who came too near, and pointing his gun at Orta as Lopez continuously swatted at the officer's gun arm, including when Raines was pointing his gun at *Orta* rather than Lopez. Video 1[7] at 3:57:17-19 (reaches up and puts hand on Raines's gun); Video 3 at 3:57:20-36 (swatting at Raines's gun around nine times); *id.* at 3:57:48-3:58:05 (swatting at Raines's gun around eight times); *id.* at 3:58:15 (swatting at Raines's gun). In these few minutes, Orta pointed the gun at Raines at least three more times. Video 2 at 3:56:55; *id.* at 3:59:36-43; Video 3 at 3:59:59-

---

[7]Video 1 is another video that is part of Defense Exhibit D, R. 78. The filename is CH05-20141130-035500-041500.avi.

4:00:03. After the third time, Orta ran away just as police cars started arriving on the scene. Video 3 at 4:00:10.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

The Defendants move for summary judgment on a number of grounds, arguing that: (1) Lopez's suit is inconsistent with his gun-crime conviction and thus barred by *Heck v. Humphrey*, 512 U.S. 477 (1994); (2) Officer Raines's use of force was not excessive; (3) Raines is protected by qualified immunity; (4) the conspiracy claim fails for lack of evidence; and (5) the indemnification claims must also be dismissed. R. 79, Defs.' Br. at 3. As discussed below, although the bar in *Heck* does not entirely preclude the suit, the Court concludes that the qualified immunity shields Raines from liability for excessive force. Lopez also failed to present evidence of a viable conspiracy claim, so summary judgment must also be granted against that claim. And without substantive claims remaining, the indemnification claims are dismissed.

### A. *Heck v. Humphrey*

In *Heck v. Humphrey*, the Supreme Court held that a person cannot bring a 42 U.S.C. § 1983 claim for damages arising from a conviction or sentence, "or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," unless that conviction or sentence has been reversed or invalidated in some way. 512 U.S. at 486-87. The bar in *Heck* prevents criminal defendants from using a § 1983 lawsuit as a collateral attack on an otherwise valid criminal conviction—a federal habeas petition is the only vehicle for that sort of challenge. *Id.* at 487; *Thomas v. Miller*, 2018 WL 1156325, at *2 (N.D. Ill. March 5, 2018). So if the civil-rights lawsuit would "*necessarily imply* the invalidity of [the] conviction or sentence,"

then the claim is not cognizable under § 1983. *Heck*, 512 U.S. at 487 (emphasis added).

To determine whether *Heck* bars a particular § 1983 claim—that is, whether the plaintiff's victory would *necessarily imply* the invalidity of the prior conviction—courts must carefully examine the relationship between the § 1983 claim and the conviction. *McCann v. Neilsen*, 466 F.3d 619, 621-22 (7th Cir. 2006). Where the grounds for the civil-rights claim are premised on the very same facts that were the basis for the conviction, *Heck* will generally bar the claim because a plaintiff typically cannot win the civil claim without implying that he did not commit the crime. *McCann*, 466 F.3d at 621. In contrast, where the facts in the civil lawsuit are distinct from the facts that underlie the criminal conviction, *Heck* does not apply because a § 1983 victory would not necessarily imply the invalidity of the conviction. *Helman v. Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014); *Evans v. Poskon*, 603 F.3d 362, 363-364 (7th Cir. 2010). The Supreme Court has emphasized that it was "careful in *Heck* to stress the importance of the term 'necessarily.'" *Nelson v. Campbell*, 541 U.S. 637, 647 (2004). "To hold otherwise would have cut off potentially valid damages actions as to which a plaintiff might never obtain favorable termination—suits that could otherwise have gone forward had the plaintiff not been convicted." *Id.*

A prime example of the care with which federal courts examine *Heck* is the relationship between convictions for resisting arrest and a follow-up lawsuit for excessive force during the course of the same arrest. It would be easy—as it turns out, too easy—to simply say that if an arrestee is convicted for resisting arrest, then

a later suit that alleges excessive force during that arrest must be barred by *Heck*. After all, if the arrestee resisted an officer's attempt to make an arrest, then wasn't the officer entitled to use force? But no: even if an arrestee resists, it is not *necessarily* the case that the officer may use *any* intensity of force in completing the arrest. Consider an arrestee who resists arrest by taking a step back away from the officer. The officer could not then shoot the arrestee and later invoke *Heck* to bar an excessive-force claim. *McCann*, 466 F.3d at 621 ("A contrary conclusion … would imply that once a person resists law enforcement, he has invited the police to inflict any reaction or retribution they choose, while forfeiting the right to sue for damages.").

At the same time, however, even if a civil-rights claim is *theoretically* compatible with prior conviction, it is still possible for a civil-rights plaintiff to run head-long into the *Heck* bar by pleading or by pursuing the claim based on facts that *do* necessarily imply the invalidity of the conviction. *McCann*, 466 F.3d at 621-22. For example, in *Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003), a plaintiff alleged that officers had illegally seized gems from his home. *Id.* An illegal-seizure claim in theory can be compatible with a prior conviction, because a conviction does not necessarily say anything about the legality of seized evidence. *Id.* But in that particular civil-rights case, the plaintiff had been convicted of heroin possession and yet he explicitly premised the illegal-seizure claim on the argument that he had been framed; there was no heroin, only gems. *Id.* That version of the facts steered the

plaintiff right into the bar in *Heck*: if he won on that theory, then the victory would necessarily imply the invalidity of the heroin conviction. *Id.*

In Lopez's case, although there are several facts that have been established by the criminal conviction, a close examination of the conviction and excessive-force claim—or at least a narrower version of his claim—shows that *Heck* does not bar the suit. To start, both sides agree that the charge to which he pled guilty was aggravated discharge of a firearm, and a specific form of it, namely, 720 ILCS 5/24-1.2(a)(2). DSOF ¶ 1 (citing § 24-1.2(a)(2)); Pl.'s Resp. DSOF ¶ 1 ("Plaintiff admits to pleading guilty to the statute cited ...."). Section 24-1.2(a)(2) defines aggravated discharge of a firearm as knowingly or intentionally firing in the "direction" of another person or a car with a person inside it:

> (a) A person commits aggravated discharge of a firearm when he or she knowingly or intentionally …
>
> > (2) Discharges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person.

720 ILCS 5/24-1.2(a)(2). The specific charge to which Lopez pled guilty alleged that Lopez "knowingly discharged a firearm in the direction of another, to wit, Terrence Hudson." R. 87-1, Plea Tr. at 3-4.[8]

---

[8]There was some confusion at the plea colloquy on the number of the count, specifically, whether it was Count 5 or Count 11. Plea. Tr. at 2-3. On the certified statement of conviction, the indictment's Count 5 appears to the be the correct number of the charge to which Lopez pled. R. 78-1 (Count 5 cites § 24-1.2(a)(2), whereas Count 11 cites § 24-1.6(a)(2)). But whatever the number the state judge described the pertinent charge to Lopez, and then Lopez pled to that charge. Plea Tr. at 3-4.

In the abstract, one would think that an officer could use deadly force against someone who has just fired in the "direction" of another person. After all, as detailed in the Opinion's next section, the Fourth Amendment authorizes an officer to use deadly force when there is probable cause to believe that a suspect poses a threat of serious harm to others. *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). But it turns out that, under Illinois law, firing in the "direction" of another person does *not* require that the shooting pose a "threat of serious harm." *People v. Ellis*, 929 N.E.2d 1245, 1248-49 (Ill. App. Ct. 2010) ("We find that the threat of serious harm is not an inherent element of the offense of aggravated discharge of a firearm, which only requires that a defendant fire in the direction of a person or occupied car."). As interpreted by Illinois courts, "not every aggravated discharge of a firearm threatens the same amount of harm," *id.* at 1249, nor (to repeat) is a threat of serious harm an element of the crime. So—as menacing as the crime of aggravated discharge of a firearm sounds on its surface—there is actually no necessary inconsistency between prevailing on the excessive-force claim and the prior conviction.[9]

---

[9]Having said that, it is worth pointing out that, had this case gone to trial, Lopez almost surely would have to own the facts to which he pled guilty. Issue preclusion (still sometimes called "collateral estoppel") prevents a litigant from relitigating a legal or factual issue that has been conclusively determined in a prior case, and that was necessary to resolve in arriving at the prior judgment. *Wells v. Coker*, 707 F.3d 756, 761 (7th Cir. 2013). Although courts must confirm that the issue was strictly necessary to the judgment, *id.* at 761-62 (alternative grounds for guilty plea rendered each ground unnecessary to the judgment), here Lopez pled guilty to "knowingly discharg[ing] a firearm in the direction of another, to wit, Terrence Hudson." Plea Tr. at 3-4. The definition of "direction" for that crime would have required some explanation to the jury, but Lopez would likely have been stuck with that fact. What's more, by pleading guilty to the crime, Lopez necessarily could not assert that he acted in self-defense under Illinois law, that is, he fired the gun because it was purportedly "necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a).

**B. Excessive Force**

**1. Qualified Immunity Standard**

With the *Heck* bar cleared, it is time to consider the excessive-force claim. The defense argues that the undisputed facts establish that Officer Raines's use of force was justified, or that, at worst, he is entitled to qualified immunity. Defs.' Br. at 7-13. As explained in detail below, qualified immunity does apply, so the Court need not answer the straight-out merits question. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Under qualified immunity, government officials are shielded from civil liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Zimmerman v. Doran*, 807 F.3d 178 (7th Cir. 2015) (cleaned up).[10] To defeat qualified immunity, a plaintiff must establish both that (1) the defendant violated a constitutional right and (2) the right was "clearly established," *Pearson*, 555 U.S. at 232, both "at the time and under the circumstances presented," *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016). A right is "clearly established" if the conduct is so clearly prohibited that every "reasonable official would [have understood] that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

---

[10]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. See Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Courts are permitted "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first ...." *Pearson*, 555 U.S. at 236. Here, because there is no bright-line, recurring legal issue at stake, the Court chooses to address first (and actually last) whether what Officer Raines did violated a clearly established right.

## 2. Fourth Amendment Limits on the Use of Force

Keeping in mind that qualified immunity asks about the specific conduct in each particular case, *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (whether a right was "clearly established" at the time of an official action must be assessed in a "particularized" sense, rather than "at a high level of generality") (cleaned up), still it is important to set forth the general standard for the use of force and, somewhat more specifically, the use of deadly force. Whether the force used by an officer complies with the Fourth Amendment turns on whether "the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). That assessment is made from the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Burton v. City of Zion*, 901 F.3d 772, 777 (7th Cir. 2018). Courts must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

On deadly force, as mentioned earlier, the Fourth Amendment authorizes an officer to use deadly force when there is probable cause to believe that a suspect poses a threat of serious harm to others. *Garner*, 471 U.S. at 11-12. When an officer reasonably believes that a suspect's actions place the officer or others "in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Horton*, 883 F.3d at 949. In most circumstances, an officer may use deadly force when the officer reasonably believes that a suspect "committed a felony involving the threat of deadly force, was armed with a deadly weapon, and was likely to pose a danger or serious harm to others if not immediately apprehended." *Id*.

### 3. The Shooting

Against those substantive standards, it is finally time to turn to the facts of this case, as viewed through the lens of giving reasonable inferences to Lopez. It makes sense to divide the analysis of the excessive-force claim into two general categories of conduct: (1) when Raines shot Lopez; and (2) when Raines put a gun to Lopez's temple and used Lopez as what Lopez calls a "human shield" as protection against the shots fired by Lopez's accomplice, Mario Orta.

First up is the shooting. Lopez argues that Raines had no reason to shoot Lopez at all (let alone more than once) because, according to Lopez, all that Raines knew was that Lopez was holding a gun. Pl.'s Resp. Br. at 7-8, 14. To Lopez's way of thinking, Raines "never witnessed" Lopez firing or waving his gun at bystanders, and Raines's contention (made during investigative interviews before Raines passed

away) that "Lopez turned and pointed his gun at him" was "a fabrication." *Id.* at 8. What's more, Lopez asserts, Raines failed to announce himself as an officer and did not even command Lopez to drop the gun before shooting. *Id*. Again, Raines told investigators that he did announce he was an officer and did order Lopez to drop the gun. R. 81-6, Pl.'s Resp. Br., Exh. F, SAO Lopez 602.

Viewing the evidence in Lopez's favor, it must be taken as true that Lopez did not point the gun at Raines; Raines did not announce his authority; and Raines did not order Lopez to drop the gun. There simply is no indisputable evidence to the contrary, and Lopez can testify from personal knowledge on those facts—and he must be credited at this summary judgment stage. But Lopez's contention on a crucial point must be rejected. Specifically, based on the video recording, Raines certainly *did* arrive on the scene in time to see and to hear Lopez firing his gun. At 3:56:11 (that is, 3:56 a.m. and 11 seconds) on the video, Raines runs into the intersection. Video 3 at 3:56:11. In this snapshot, Raines is the person circled in red at the top center of the screen, and Lopez is circled in blue; he has yet to begin crossing back toward his car and has not yet fired the gun:



At this point, Raines starts to move across the intersection; at the same time, Lopez starts moving back toward his car. *Id.* at 3:56:11-16. At 3:56:20, Lopez fires into the air in the direction of the victim (Terrance Hudson) two times. This next snapshot captures the moment when Lopez fires the second shot (the video itself shows the bullets firing out of the gun), with Lopez again circled in blue and Raines, who has moved further into the street, in red:



Based on the video evidence, no reasonable jury could find that Raines did not see—or at least hear—Lopez firing the shots. At the very most, Raines is two street lanes and three car lengths away from Lopez when he fired the two shots. On what evidence would a juror premise a finding that Raines did not see or at least hear Lopez firing those shots?

Next, the video also indisputably shows Lopez continuing to walk towards his car, which is in the general direction of Raines—because Raines, too, is starting to walk toward Lopez. Video 3 at 3:56:20-24. As Lopez and Raines move generally toward each other, Lopez waves the gun up to shoulder level and then back down. *Id.* at 3:56:22. The Court must credit, for summary judgment purposes, Lopez's assertion that he was not *aiming* at Raines, and a reasonable jury could find that Lopez was waving the gun up and down, as in brandishing it, rather than pointing it directly at Raines, and that Lopez did not even register in his mind that Raines was there. But even Lopez admits (as he must) that he was holding the gun, and there is no evidence to refute that Raines saw Lopez holding it.

On those facts, even viewing the evidence in the light most favorable to Lopez, it was not clearly established that Raines's decision to shoot Lopez was objectively unreasonable. At the very least, Raines *heard* two gunshots[11] and then immediately saw Lopez holding a gun (if he had not already seen Lopez holding it), giving Raines

_____

[11]There is an irony here: it might be that the evidence in the light most favorable to Lopez would be to say that Raines actually *saw* Lopez fire the shots, because at least those shots were fired at an upward angle (though not straight up into the air) rather than directly at someone. Just *hearing* the shots, in the context of a shots fired near pedestrians in a city street, likely would give probable cause (at least for qualified-immunity purposes) that the shooter was firing directly at people.

well more than probable cause to suspect that Lopez had just squeezed off two rounds in the middle of a city street. No case clearly established that Raines would *know* that the shooter did not pose an imminent threat of serious danger to others. Yes, it was 3:56 a.m. in the late night (or early morning), but several pedestrians were on the street and the sidewalks, and at least two cars drove around the area after Raines arrived on the scene, Video 3 at 3:56:12-13, 3:56:19-21, and just seconds before, even more car traffic was in the area and drove by Raines as he approached the intersection, *id.* at 3:56:6-11. Not to mention that Raines himself was in imminent danger under those circumstances.

The same lack of clarity applies to the issue of whether Raines acted unreasonably by not giving a warning of some sort (like announcing his authority or ordering Lopez to drop the gun). Of course, a warning is generally preferred; but it is required only "where feasible," not under all circumstances. *Garner*, 471 U.S. at 11-12; *Horton*, 883 F.3d at 952. Lopez points to no case law that would have alerted a reasonable officer that the officer was *required* to give a warning before firing on a suspect in these circumstances. Raines and Lopez were moving toward each other and already were very close (as noted earlier, at most two street lanes and three car lengths apart), and a warning might very well have given the advantage to Lopez— who had just fired the gun twice all of *seven seconds* ago—to fire at Raines. It is perhaps true that other officers, maybe even many other officers, in that situation would have announced their authority and given a warning before firing. But no case clearly established that a warning was required.

Lopez also argues that Raines used excessive force by continuing to shoot Lopez beyond the moment when Lopez dropped his gun. Pl.'s Resp. Br. at 8-9. Although the defense disputes that Raines saw Lopez's gun drop, R. 88, Defs.' Reply Br. at 9-10, viewed in the light most favorable to Lopez, the Court takes as true that Raines did see Lopez drop the gun. Again, however, no clearly established law would have alerted a reasonable officer that, in these blink-of-an-eye circumstances, the dropping of the gun eliminated the danger posed by Lopez. The video shows that Raines first struck Lopez at 3:56:27; Lopez drops the gun one second later at 3:56:28 as he turns and starts to run from Raines; and Raines continues to fire for two more seconds, ending at 3:56:30. Video 3 at 3:56:27-30. In the quiet of chambers (or, in these pandemic days, part of a basement doubling as a home office), it is all too easy to slow down a video and pick it apart to question why Raines kept firing. But courts must "allow[] for the fact that police officers are often forced to make split-second judgments." *Graham*, 490 U.S. at 397. Lopez had not surrendered, he was still mobile and moving, and he did just fire two shots on a city street a few seconds ago. Even without the gun, a reasonable officer would not necessarily know that the Fourth Amendment forbids continuing to fire under these circumstances. Lopez certainly cites no case that dictates that result. Qualified immunity applies to the shooting itself.

### 4. On the Sidewalk

Turning next to what Raines did to Lopez on the sidewalk, Lopez argues that Raines used excessive force when he put Lopez in a chokehold, pointed a gun at

Lopez's temple, and threatened to kill Lopez. Pl.'s Resp. Br. at 14. Lopez asserts that he was compliant with Raines's attempt to arrest him and there was no reason for that use of force. *Id.* at 11. In essence, Lopez contends, Raines used Lopez as a "human shield" from the danger posed (and actual shots fired) by Lopez's cohort, Mario Orta. *Id.* at 14. This is a very, very close call, but again the Court concludes that qualified immunity applies to what Raines did.

As a threshold matter, it is true that pointing a gun at a person at all (let alone at someone's head) is certainly an act of force. *Jacobs v. City of Chicago*, 215 F.3d 758, 773-74 (7th Cir. 2000). And a police officer cannot continue to use force against a suspect who is subdued and complying with an officer's orders. *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009). There are myriad cases holding that pointing a gun at a non-violent or non-threatening suspect is objectively unreasonable. *See, e.g.*, *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) (unreasonable for officer to detain suspects with a 9-milimeter submachine gun for a non-violent crime); *Jacobs*, 215 F.3d at 573-74 (unreasonable for officer to point gun at head of elderly man who was not a suspect, presented no resistance, and did not engage in threatening conduct); *McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir. 1992) (unreasonable for police to hold gun to a boy's head and to threaten to pull the trigger where child was not a suspect, not evading officers, and posed no threat); *Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989) (denying qualified immunity where officer held gun to the head of an arrestee who was unarmed, handcuffed, and cooperating).

But Lopez was not a non-violent, compliant arrestee. And the circumstances—with Mario Orta armed and firing shots at Raines—were anything but safe. First, as detailed above, Lopez had fired two gunshots on a city street, so the danger that Raines faced right before apprehending Lopez on the sidewalk was serious. That Lopez had fired those shots is important context for the entire encounter. Next, Orta picked up Lopez's dropped gun, Video 3 at 3:56:31, and then *fired a shot at Raines* almost immediately, Video 2 at 3:56:32-33.

So the stage is set now: Raines is trying to arrest someone who just fired two shots on a city street. He is on his own with no backup, and suddenly someone else (Orta) fires a shot at him. A reasonable officer in that position also would reasonably believe, even if not be 100% certain, that the new shooter is the suspect's associate (why else get involved?). On that stage, the drama continues: Orta goes in, but then soon comes back out of, a covered building entrance. Video 3 at 3:56:41 (going in); *id.* at 3:56:54 (comes back out). Orta is still holding the gun, and walks off for a bit, but then approaches again. *Id.* at 3:57:13. He comes within a few feet of Raines and then aims the gun *directly* at Raines. *Id.* at 3:57:19. Orta then backs away several feet. At this point, the video footage contradicts Lopez's generalized contention that Lopez was completely compliant and subdued. When Raines pointed his gun at Orta—who had just aimed right at Raines—Lopez repeatedly swatted at Raines's gun arm, including when Raines was pointing his gun at *Orta*. Video 1 at 3:57:17-19 (reaches up and puts hand on Raines's gun); Video 3 at 3:57:20-36 (swatting at Raines's gun around nine times); *id.* at 3:57:48-3:58:05 (swatting at Raines's gun around eight

times); *id.* at 3:58:15 (swatting at Raines's gun). In these few minutes, Orta points the gun at Raines at least three more times. Video 2 at 3:56:55; *id.* at 3:59:36-43; Video 3 at 3:59:59-4:00:03. So when Lopez swatted at Raines's gun arm, a reasonable officer could have believed that Lopez was preventing Raines from protecting himself from Orta's deadly threat. *Johnson*, 576 F.3d at 659 ("[n]ot all surrenders … are genuine, and the police are entitled to err on the side of caution when faced with an uncertain or threatening situation").

True, as the Court acknowledged at the outset, this is a very, very close case and tests the outer boundaries of qualified immunity. As Lopez argues, Raines did maneuver Lopez's body to sit in between Raines and Orta, and, at various times, Raines did hold a gun to Lopez's temple. So yes, a reasonable jury could find that Raines in effect used Lopez to shield himself and to deter Orta. But deter Orta from what? From *killing* Raines. Remember that Orta had already fired a shot at Raines before Lopez was used as a shield. And Raines had every reason to believe that Orta was somehow associated with Lopez and would avoid harming Lopez. With the mortal threat posed by Orta, a reasonable officer would not know that putting Lopez between himself and Orta and then threatening to shoot Lopez would cross the line into excessive force. Raines would have been an open target for someone who had just fired at him and who was associated with the suspect. On these unique facts, Lopez has not "identif[ied] a closely analogous case," nor was "the conduct [] so egregious and unreasonable that … no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon Cty.*, 705 F.3d 706, 723-24 (7th Cir. 2013). What

Raines did on that sidewalk—as alarming as it was—did not violate a clearly established constitutional right. Qualified immunity applies. The excessive-force claim must be dismissed.

### C. Conspiracy

The defense also asks for summary judgment against Lopez's conspiracy claim, arguing that Lopez has presented no evidence and cannot identify "who was involved, when they met, or what their goals were." Defs.' Br. at 17. Even if there were a conspiracy, the Defendants argue, then it did not cause any injury. *Id.* In response, Lopez counters that the conspiracy was between "the County, the Sheriff, and Raines" to impede Lopez's due process rights by engaging in a "cover up." Pl.'s Resp. Br. at 17-18. Specifically, Lopez alleges that the Defendants failed to meaningfully investigate the shooting, to assess whether each bullet Officer Raines fired was reasonable, and to test the officer for drugs or alcohol. *Id.* at 18-19. Lopez also claims that the investigators ratified "false statements" by Raines, specifically, the statement that Lopez pointed his gun at the officer. *Id.* at 18.

In briefing this conspiracy claim, Lopez has some difficulty fitting it into a specific constitutional right. The point-hearing in the brief says that the Defendants "deprived Plaintiff of equal protection of the law." Pl.'s Resp. Br. at 17. But then the substantive presentation relies on the right of access to the courts, *id.* at 17-18, which is actually a right premised on the Due Process Clause and the First Amendment. *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984), *overruled on other grounds*, *Russ v. Watts*, 414 F.3d 783, 788 (7th Cir. 2005). In any event, generally

speaking, "[i]nterference with the right of court access by state agents who intentionally conceal the true facts about a crime may be actionable as a deprivation of constitutional rights under § 1983." *Rossi v. City of Chicago*, 790 F.3d 729, 734 (7th Cir. 2015) (citing *Bounds v. Smith*, 430 U.S. 817, 822 (1977)). For instance, "when police officers conceal or obscure important facts about a crime from its victims rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged." *Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995). But the Seventh Circuit has also noted that a "cover-up" by police "is merely one, albeit important, factor in determining whether a denial of judicial access occurred; the plaintiff must also show that the police's actions harmed [the plaintiff's] ability to obtain appropriate relief. This will depend on factors such as whether the plaintiff was able to discover the facts on his own, whether a proper investigation was later conducted, and whether the true facts are disclosed prior to the expiration of the limitations period." *Rossi*, 790 F.3d at 736. So, "the operative question is not whether [the plaintiff's] case would have been better had the police conducted a worthy investigation, but whether their failure to do so limited his ability to obtain legal redress to such degree that it constituted a denial of judicial access." *Id*. at 735.

To pursue a viable claim of this type, the Seventh Circuit has set a high bar, repeatedly holding that where a plaintiff was personally involved in the events giving rise to a legal claim and thus knows all the facts of their case, access to the courts is generally *not* impaired by the fabrication of evidence by law enforcement. In *Rossi*, for instance, the plaintiff was assaulted by several people, including an off-duty police

officer. 790 F.3d at 732-33. When Rossi went so far as to report the name and address of the off-duty officer to the police, the investigating officer did nothing but file a false report with the wrong name and assert that he could not find the name in the police roster. *Id.* at 733. As a result, the investigation stalled for years and material evidence was lost. *Id.* But the Seventh Circuit concluded that Rossi's court-access right had not been violated because he "knew all of the relevant facts of his case and was free to pursue legal redress at all times." *Id.* at 736.

Similarly, in *Thompson*, police had used excessive force on the plaintiff, then falsely omitted that fact from the police report of the incident. *Thompson v. Boggs*, 33 F.3d 847 (7th Cir. 1994). Again, though, there was no court-access violation because "the facts known to [the plaintiff] concerning the arrest were sufficient to enable him to promptly file the instant lawsuit[.]" *Id.* at 852. That is, the plaintiff could fully bring an excessive-force civil claim regardless of the content of the police report. And in *Vasquez*, the allegations went even farther; there, the police covered up the accidental shooting of a child, and the responsible officer was not identified until six months later, when an independent task force took over the investigation. *Vasquez*, 60 F. 3d at 329. Despite all that, the court again held that the family's access to the courts had not been impeded; even though it took six months, they were eventually able to uncover the relevant facts of the case. *Id.* In contrast, the Seventh Circuit did find that the right to court-access had been violated in *Bell.* But in that case, police had covered up a fatal police shooting by planting a knife in the victim's hand and then convincing the victim's family that the victim was actually the assailant, which

ultimately prevented the family from "learn[ing] the facts of [the] case" and "rendered hollow" the family's attempt to pursue a wrongful death suit against the city. *Bell*, 746 F.2d at 1261. But the plaintiffs in *Bell* did not have personal knowledge of the actual facts. *See also Rainey v. City of Chicago*, 2013 WL 941968, at *12 (N.D. Ill. Mar. 11, 2013) (court-access right deprived because police report failed to identify the officer involved in an excessive-force claim, and plaintiff could not know the officer's identity because the plaintiff's eyes were closed).

Lopez's case is much closer to *Thompson*, *Vazquez*, and *Rossi*, where there was no violation of the court-access right, than to *Bell*. To the extent that Lopez relies on the investigators' ratification of Raines's story that Lopez pointed the gun at him, Lopez of course has personal knowledge of his version of the facts, that is, that he never pointed the gun at Raines. Lopez's personal knowledge fatally undermines the claim of denial of court access. To the extent that Lopez targets the investigators' alleged failings in pursuing the investigation of the shooting, the conspiracy claim must fail because there is no generalized constitutional right to have the police investigate one's case, and "still less to one's satisfaction." *Rossi*, 790 F.3d at 734. Again, "the operative question is not whether [Lopez's] case would have been better had the police conducted a worthy investigation, but whether their failure to do so limited his ability to obtain legal redress to such degree that it constituted a denial of judicial redress." *Id*. Here, that simply is not the case. With the availability of both the video footage and Lopez's own memory, Lopez had ample access to the facts (and

has presented them in this case). No reasonable jury could find a denial of the right to access the courts.

### D. Municipal Liability

On the *Monell* claims, a municipality—like Cook County—may be held liable for the constitutional injuries inflicted by its agents *only* if the injury was caused by the municipality's policy or custom. *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 694 (1978). So a civil-rights plaintiff cannot simply rely on *respondeat superior*. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986). To prevail on a municipal-liability claim, the plaintiff must show that the injury was caused by "(1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well settled as to constitute a custom or usage with the force of law even though it is not authorized by written law or express policy; or (3) an allegation that a person with final policy-making authority caused the constitutional injury." *Lawrence v. Kenosha Cnty.*, 391 F.3d 837, 844 (7th Cir. 2004). Importantly, in most cases, if there is no underlying constitutional violation, then there is no municipal liability. *Horton*, 883 F.3d at 954.

Here, much of Lopez's *Monell* claim is premised on his conspiracy allegations, namely, that he suffered a "constitutional injury caused by the cover up, ratification, omissions, and fabricated reports ratified by the County Sheriff and the County along with a custom of tolerance of federal rights violations." Pl.'s Resp. Br. at 19. Without a viable conspiracy claim for denial of court access, there is no corresponding *Monell* liability. The catch-all point Lopez raises—an alleged "custom of tolerance of federal

rights violations"—is inadequately supported, either by legal or factual development. At the summary judgment stage, the moving party may discharge its burden by "pointing out to the district court … that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The nonmoving party "must then make a showing sufficient to establish the existence of an element essential to that party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (cleaned up). To meet this burden, the nonmovant must "go beyond the pleadings … to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [his] favor." *Id.* at 1169. Here, other than making the bare-bones allegation of a "custom of tolerance of federal rights violations," Lopez has provided zero evidence to advance that theory of liability. So the defense is also entitled to summary judgment on this claim, too.[12]

### E. Motion to Strike Stavropoulos Affidavit

The final issue is whether to strike the affidavit of eyewitness Nector Stavropoulos, which Lopez offered in response to the defense's summary judgment motion. The problem for Lopez is that he did not properly describe to the defense the subjects of the discoverable information that Stavropoulos knew.

By way of background, on October 24, 2017, Defendants made their initial Rule 26(a)(1) disclosures to Lopez. R. 89-1, Exh. A. The defense disclosure listed Nector Stavropoulos as a person likely to have discoverable information. *Id.* at 2 ¶ A(11). The

---

[12]It was not very clear whether Lopez had sued the Sheriff of Cook County individually or in his official capacity, but as explained above, neither form of liability is supported by sufficient evidence.

way the defense described the subject matter of his knowledge was as follows, referring to a Bates-label for an interview report: Stavropoulos "would be expected to testify in accordance with his statement recorded at SAO Lopez 140-152." *Id*. The defense disclosure also reported "unknown" for Stavropoulos's address and phone number. For his part, Lopez made Rule 26(a)(1) initial disclosures to the Defendants on November 8, 2017—but he did not mention Stavropoulos. R. 89-2, Exh. B.

On January 22, 2018, Lopez provided answers to the Defendants' interrogatories, and one of the responses listed Stavropoulos as someone who "has, or claims to have, knowledge of the facts." R. 89-3, Exh. C at 2 ¶ 2. Lopez's disclosure reported Stavropoulos's address, but no phone number. *Id*. A short time later, on February 2, 2018, the defense supplemented their initial disclosures, again describing Stavropoulos's phone number and address as "unknown" and stating that Stavropoulos would be expected to testify in accordance with his comments in the police reports. R. 89-4, Exh. D at 2 ¶ A(11). Lopez never supplemented his initial disclosures.

On February 12, 2018, the Court extended the five-month fact-discovery period to end on a new deadline, April 25, 2018, and instructed the parties to file a Joint Deposition Status Report with confirmed dates for the remaining depositions, warning that any persons not on the Report "will presumptively not be deposed unless there is good cause shown (*e.g.*, genuine surprise)." R. 34. The parties' joint report did not include Stavropoulos as a person to be deposed. R. 35. Lopez then changed counsel and canceled the remaining scheduled depositions, at which point the Court extended

fact discovery to July 11, 2018 for the "sole purpose" of taking the previously scheduled depositions. R. 41. Stavropoulos was not deposed by either party. R. 89, Mot. Strike at 3.

On this record, the disclosure of Stavropoulos by Lopez came much too late. Under Federal Rule of Civil Procedure 26(a)(1)(A)(i), parties must disclose to one another the name and "if known, the address and telephone number of each individual likely to have discoverable information—along with *the subjects of that information*—that the disclosing party may use to support its claims or defenses … ." Fed. R. Civ. P. 26(a)(1)(A)(i) (emphasis added). If the initial disclosures are incomplete, then the parties must supplement the disclosures "in a timely manner." Fed. R. Civ. P. 26(e). Also, a failure to properly identify witnesses as required by Rule 26(a)(1) precludes a party from using the witness "to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In deciding whether an incomplete disclosure is harmless, federal courts consider things like "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012).

Here, Lopez failed to properly disclose the subject matter of Stavropoulos's knowledge. Yes, Lopez listed Stavropoulos's name in one of the responses to the defense's interrogatories. Exh. C at 2 ¶ 2. But Lopez did not disclose the "subjects,"

Fed. R. Civ. P. 26(a)(1)(A)(i), of the discoverable information that Stavropoulos knew, xh. C at 2 ¶ 2. This omission was particularly important because the defense also had disclosed Stavropoulos, but described him as someone who would testify *consistent* with his prior interview. Exh. D at 2 ¶ A(11). Stavropoulos's affidavit is inconsistent with the prior interview on a number of fronts. Yet, almost one year after discovery closed, Lopez offered Stavropoulos's affidavit out of the blue as part of the response to the summary judgment motion. Lopez never supplemented his initial disclosures, as required by Rule 26(e), nor had he updated the interrogatory response that reported that he had not taken any person's statement, Exh. C at 3.

Although a failure to describe a witness's subject-matter knowledge does not automatically require exclusion of the witness, Lopez advanced no argument that the failure did no harm. Indeed, given that the Stavropoulos affidavit was filed almost one year after discovery concluded, the defense could not depose Stavropoulos to investigate his averments. And, as the defense points out, Lopez attached the affidavit to his response specifically because it *is* harmful to Defendant's case. While the police reports memorialized Stavropoulos as having said only that he possessed security footage of the incident, the Stavropoulos affidavit provides several additional facts, including that Lopez never fired shots at anyone, Stavropoulos Aff. ¶ 9; Raines never identified himself as an officer before shooting Lopez, *id.* ¶ 6; and the officers who took Stavropoulos's statement called him a liar and recorded him inaccurately, *id.* ¶¶ 11, 16. Of course the defense would have followed-up in investigating and

almost surely deposing Stavropoulos if Lopez had properly disclosed the subject-matter of Stavropoulos's knowledge. The motion to strike the affidavit is granted.

For what it is worth, as explained earlier, even if the affidavit had been properly disclosed, the outcome of the summary judgment motion would be the same. Stavropoulos's assertions about the shooting conspiracy were either already accepted as true (Raines did not announce his office); contradicted by the guilty plea and ultimately not material to the excessive-force claim (Lopez did not shoot at anyone); or still would not establish the conspiracy claim (officers did not record him accurately) because Lopez had sufficient personal knowledge of the facts and nothing prevented him from interviewing Stavropoulos.

## IV. Conclusion

Even when viewed in the light most favorable to him, Lopez's claims do not survive summary judgment. Qualified immunity applies against the excessive-force claims, and there is no viable conspiracy or *Monell* claim. Without any substantive claims remaining, the indemnification claims against the County and the Sheriff also must fail. The defense's motion for summary judgment is granted. The Court will enter final judgment. The status hearing of April 28, 2020 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2020